1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   TONY ARMSTRONG,                              No. 2:15-cv-1090 MCE DB P

12                        Petitioner,

13          v.                                    FINDINGS AND RECOMMENDATIONS

14   KAMALA HARRIS,

15                        Respondent.

16

17          Petitioner is a state prisoner proceeding pro se and in forma pauperis with a petition for a

18   writ of habeas corpus under 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction

19   entered against him on September 9, 2014 in the Sacramento County Superior Court on a count of

20   second degree murder with a gun enhancement.  He seeks federal habeas relief on the grounds

21   that: (1) there was insufficient evidence to convict him of aiding and abetting; (2) counsel was

22   ineffective for failing to object to gang evidence; (3) counsel was ineffective for failing to object

23   to prosecutorial misconduct in closing argument; (4) instructional error; and (5) the cumulative

24   effect of all errors violated due process.

25          Upon careful consideration of the record and the applicable law, the undersigned

26   recommends that petitioner's application for habeas corpus relief be denied.

27   ////

28   ////

## BACKGROUND

The victim, Jose Guerrero, lived on Lindley Drive in Sacramento, in an area known as the Flats. At the time of his death, he had lived there for about eight years with his wife, Celica Cardenas, and their children.[fn 1]

The Flats is predominantly controlled by two street gangs, the Norteños and the Bloods, both of which identify with the color red. The Norteños and the Bloods are known to associate with each other in the Flats. There are also Sureños in the area, however. The Sureño street gang, which identifies with the color blue, is the main rival of the Norteños. A Norteño gang member would take it as a sign of disrespect if a Sureño gang member wore blue in a Norteño neighborhood, and such an act could lead to a verbal or physical confrontation.

The house where Guerrero and Celica lived with their children was on the north side of Lindley between Grove Avenue to the east and Edgewater Road to the west. The house was known in the Flats as being associated with the Sureños. In fact, Celica's 21–year–old son, Federico, who had been living in the house off and on up until the time of the shooting, was a validated Sureño gang member.

Defendant is a validated member of the Del Paso Heights Bloods who goes by the nickname "T Blood." Among others, he has a tattoo on his stomach that reads, "Hood Boss," a tattoo on his left forearm that reads, "Da Flats," and a tattoo on his back that reads, "Blood 4 Life."

Defendant was known to associate with Norteño gang members. In particular, he was friends with Noe Ortiz, a Norteño associate who lived on the northwest corner of Lindley and Edgewater, down the street from Guerrero's house. Defendant was also friends with Jose Gonzalez (also known as Pepe), a friend of Noe's who is a validated Norteño gang member. Defendant and Pepe sold "weed" back and forth to each other.

Noe and Pepe were part of a group of friends—all of whom are associated with the Norteño gang—who went to Grant High School and hung out together. The other members of the group were Pepe's brother, Juan Carlos Gonzalez (also known as Cho Che); Jaime Torres; Jaime's brother, Hugo Torres; Jaime and Hugo's uncle, Sergio Torres; and Mario Vargas. Jaime, Hugo, Sergio, and Vargas are all Norteño gang members (Vargas is validated), and Juan Carlos is a Norteño associate.

In the early evening on Memorial Day in 2008, Guerrero was sitting out in front of the open garage door of his house visiting with a friend and the friend's two children. One of the friend's children, Christian, who was 15 years old, was wearing a blue baseball cap and long blue shorts.

While they were sitting there, Christian noticed a Hispanic male drive by twice on a four-wheeled motorcycle, staring and "giving

[them] a bad look." Fifteen to 30 minutes later, Christian saw a blue car with four or five people in it driving past from east to west. The person in the front passenger seat, who was wearing a red bandana covering his nose and mouth, was leaning out of the car window flashing a gang sign—specifically, an "L" made with his thumb and forefinger, which Christian understood to be a Norteño gang sign signifying the "l" in Gardenland. The car was initially going fast as it approached Guerrero's house, but it slowed down for the speed bump in the street just beyond Guerrero's driveway, then sped away.

Around this same time (7:00 p.m.), down Lindley to the west, about three houses west of the intersection with Edgewater, Luis Cabrera was in his front yard barbecuing when he saw a blue Chevrolet four-door "going really fast" westward on Lindley with "somebody hanging out the window." Cabrera could tell the driver was a black man, but could not tell more than that because the car was going too fast; he did, however, recognize the car as one defendant regularly drove. (Other evidence confirmed that the blue Chevrolet Lumina with the grey hood was defendant's car.) The person hanging out the front passenger window was a Hispanic male who had a "red rag" covering his face and was throwing gang signs. The car drove past Cabrera's house and out of sight.

Thinking that the guy wearing the red rag going by Guerrero's house might be some kind of gang challenge, Cabrera walked from near his front door, where he was standing when the car went by, to the sidewalk and looked back up the street. There, he saw two cars parked near the intersection of Lindley and Edgewater—a white car he did not recognize and a two-tone Chevelle he recognized as one that Pepe drove. He also saw four or five Hispanic males, including "the guy with the rag on his face," "[k]ind of like power walking" from out of his view on Edgewater, turning up Lindley toward Guerrero's house, pulling up their pants and cinching their belts as if they were preparing for a fight.[fn 2] Cabrera recognized Pepe as being among that group.

Cynthia Gutierrez, Noe's girlfriend at the time, lived on the south side of Lindley, approximately midway between Guerrero's house and the intersection of Lindley and Edgewater. She was sitting in a car in front of her house with a friend when she saw Pepe and Jaime, who had a red bandana on his face, walking fast up Lindley toward Guerrero's house. They looked mad and like they were about to fight. Gutierrez moved the car down the street and parked in front of the friend's house, which was across the street and two houses down from Guerrero's house. When she got out of the car, Gutierrez saw Jaime and Guerrero yelling at each other.

Meanwhile, about 10 minutes after the blue car drove past Guerrero's house, Christian saw "like 15" or "like 20 people" walking up to the house from the west. One of them, who was wearing a red bandana on his face and whom Christian thought was the same person who had leaned out of the blue car when it drove by, came onto the sidewalk, while the others remained in the street. (Based on Gutierrez's testimony, and other evidence, the person

with the red bandana on the sidewalk was Jaime.) Jaime said, "where are your cousins," then began moving up the driveway cursing repeatedly, "where are the fucking scraps?" "Scrap" is a derogatory word for a Sureño. At some point, Jaime, who was in the middle of the driveway, stared at Christian, who was wearing blue, pulled out a gun and showed it to them, then put it back. Jaime then backed up.

When Guerrero saw the gun, he stood up and took out his cell phone and announced two or three times that he was calling the police. Jaime told him not to call the police, that they only wanted to talk to "the cousins"—which Christian understood to refer to Celica's sons, Roberto and Federico. When Guerrero did not put down the phone, Jaime took out his gun again and pointed it at Guerrero. Guerrero dropped his cell phone and rushed at Jaime, then grabbed him and started wrestling with him. The struggle moved from the driveway, onto the sidewalk, and into the street. As Guerrero struggled to get the gun, the bandana slipped from Jaime's face, and he struggled to pull it back up. Guerrero managed to hit the gun and knock it out of Jaime's grasp into the street, where the rest of the group was standing. One of the members of the group picked up the gun and approached to where Guerrero and Jaime were still struggling against each other. He pointed the gun at Guerrero and fired once, but missed. He fired a second time, and the bullet struck Guerrero in the head, penetrating through his brain into his neck. Guerrero immediately fell forward on his face and later died at the hospital from the gunshot wound.

Meanwhile, when Guerrero fell, Jaime and everyone else in the street ran back down Lindley toward Edgewater. Vargas (who testified at trial under a grant of immunity) admitted to police he was outside Noe's house with Noe, Pepe, Juan Carlos, Hugo, and Sergio. He claimed he remained at the corner, and while he said he did not remember whether his friends walked up the street, he did tell the police they came running back, and Jaime said "'[m]an, that guy just shot.'"

According to Vargas, he, Pepe, Juan Carlos, Sergio, and Hugo fled in the Chevelle, while Jaime left in another car. On a nearby street (Arcade Boulevard), the Chevelle got stuck briefly on a tree stump that was in the road. When the two front occupants got out of the car, they were holding large beer bottles. They managed to free the car from the stump and drive away, but they left one of the beer bottles behind, as well as a trail of fluid from the car. The next morning, the police followed the trail to the home of Pepe and Juan Carlos.

Meanwhile, about three to five minutes after the Chevelle drove away leaving the beer bottle behind, a police car came by and the witness who saw the Chevelle pointed the police in the direction the car went. The police officer immediately departed without further conversation. A minute or so later, another police officer came by, and the witness told that officer what she had seen. The officer told her to watch the bottle, then left in the direction the other officer had gone.

Five or 10 minutes later, a black SUV came by. Defendant was one of the occupants of the SUV. As the SUV was driving down Arcade, defendant told the driver to stop. When the SUV stopped, defendant got out and picked up the beer bottle that had been left behind by the occupants of the Chevelle, then got back in the SUV. During the incident, the witness watching the bottle heard someone in the SUV say, "Get that bottle so they can't get any prints off it."

In September 2008, the People charged defendant, Pepe, Juan Carlos, Noe, Hugo, Jaime, Sergio, and Vargas with Guerrero's murder. (The People later dropped the charge against Vargas and granted him immunity for his testimony.) The information included allegations that at least one principal intentionally and personally discharged a firearm, causing death, and that the crime was committed for the benefit of, at the direction of, and in association with a criminal street gang.

The prosecution's theory against defendant was that defendant aided and abetted the crime of fighting or challenging another person to fight by driving some of the Norteños by Guerrero's house just before the confrontation, and the murder of Guerrero was a natural and probable consequence of that target offense.

[fn 1] Together, Guerrero and Celica had two young daughters, and Celica had three other children of her own— a daughter and two sons.

Because many of the people involved in this case have the same surnames (e.g., Cardenas, Torres, Gonzales), to avoid confusion we will often refer to people by their first names or nicknames.

[fn 2] An aerial photograph of the neighborhood shows that after crossing Edgewater, Lindley bends southwest, then— about six houses past Cabrera's—turns 90 degrees to the northwest where, one house later, it dead ends into Redondo Avenue, such that the houses on the north side of Lindley (including Cabrera's) back up to the houses on the south side of Redondo. Following Redondo northeastward, the street bends to the east just before it crosses Edgewater two houses north of Edgewater's intersection with Lindley. The block on Redondo between Lindley and Edgewater consists of 12 houses. Thus, a car passing Cabrera's house could follow Lindley to its end, turn right on Redondo and be at the intersection of Redondo and Edgewater, two houses north of the intersection of Edgewater and Lindley, within a matter of moments.

In fact, Cabrera estimated that it was "within about two minutes" from the time he saw the blue car pass his house

////

////

5

until he saw the group walking up Lindley toward Guerrero's house.

People v. Armstrong, No. C063362, 2011 WL 3806154, at *2-4 (Cal. Ct. App. Aug. 29, 2011).[1]

**PROCEDURAL HISTORY**

On July 28, 2009, a jury found defendant guilty of first degree murder and also found the firearm use and gang enhancement allegations true. The trial court imposed a sentence of 25 years to life on the murder charge and a consecutive sentence of 25 years to life on the firearm use enhancement. However, pursuant Penal Code § 12022.53, no sentence was imposed on the gang enhancement. See Armstrong, 2011 WL 3806154, at *4 n.3 (citing People v. Brookfield, 47 Cal. 4th 583 2009)). And, the gang enhancement did not become part of the judgment. See Cal. Penal Code § 12022.53(e)(2).

Petitioner raised five issues on appeal: (1) insufficient evidence of aiding and abetting; (2) the gang expert's testimony exceeded the scope of permissible opinion and counsel was ineffective for failing to object; (3) prosecutorial misconduct in closing argument and ineffective assistance of counsel for failing to object; (4) jury instructions on the natural and probable consequences doctrine violated due process; and (5) the cumulative effect of the errors in petitioner's trial violated due process. (See Lodged Doc. 15 ("LD 15") Appellant's Opening Brief ("AOB").[2]) The Court of Appeal for the Third Appellate District rejected petitioner's claims, with one exception. The Court of Appeal found the jury instructions erroneous because they did not allow the jury to consider whether petitioner may have been guilty of only second degree murder under the natural and probable consequences doctrine. The court reversed petitioner's conviction and remanded for a retrial unless the state accepted a reduction of the conviction to second degree murder. Armstrong, 2011 WL 3806154, at *18.

////

---

[1] A copy of the Court of Appeal's opinion can also be found attached to the answer. (ECF No. 16 at 11-29.)

[2] On September 18, 2015, respondent lodged documents from the state court record. (See ECF No. 17.) Citations herein to the Record of Transcript are indicated by "RT" and citations to the Clerk's Transcript on Appeal are "CT."

6

1    Both parties petitioned for review before the California Supreme Court.  On November

2    30, 2011, the court denied petitioner's petition and granted respondent's.  (See LD 18, court

3    docket in People v. Armstrong, No. S196985.)   The court deferred further briefing in the case

4    pending disposition of a related issue in People v. Favor, No. S189317.  (Id.)  On October 31,

5    2012, the court again deferred briefing pending the disposition of People v. Chiu, No. S202724.

6    (Id.)  On August 13, 2014, the court dismissed respondent's petition based on the decision in

7    People v. Chiu, 59 Cal. 4th 155 (2014).[3]  (Id.)

8         On September 9, 2014, the superior court, noting that the state accepted the reduction of

9    the crime, modified petitioner's judgment to reflect a conviction for second degree murder.

10   Petitioner was then sentenced to 15 years-to-life for second degree murder, plus an additional and

11   consecutive 25 years-to-life for the gun enhancement.  (LD 19.)

12        It does not appear that petitioner raised any claims through the state habeas corpus

13   process.

14                 **STANDARDS OF REVIEW APPLICABLE TO HABEAS CORPUS CLAIMS**

15        An application for a writ of habeas corpus by a person in custody under a judgment of a

16   state court can be granted only for violations of the Constitution or laws of the United States.  28

17   U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

18   application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502

19   U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

20        Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

21   corpus relief:

22            An application for a writ of habeas corpus on behalf of a person in
             custody pursuant to the judgment of a State court shall not be
23           granted with respect to any claim that was adjudicated on the merits
             in State court proceedings unless the adjudication of the claim –
24
             (1) resulted in a decision that was contrary to, or involved an
25           unreasonable application of, clearly established Federal law, as
             determined by the Supreme Court of the United States; or
26

27   [3] The California Supreme Court in Chiu held that an aider and abettor may not be convicted of
     first degree premeditated murder under the natural and probable consequences doctrine.  59 Cal.
28   4th at 166.

                                              7

1
2

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

3  For purposes of applying § 2254(d)(1), "clearly established federal law" consists of

4  holdings of the United States Supreme Court at the time of the last reasoned state court decision.

5  Greene v. Fisher, 565 U.S. 34, 37 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011)

6  (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). Circuit court precedent "'may be

7  persuasive in determining what law is clearly established and whether a state court applied that

8  law unreasonably.'" Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th

9  Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle

10 of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not

11 announced." Marshall v. Rodgers, 133 S. Ct. 1446, 1450 (2013) (citing Parker v. Matthews, 567

12 U.S. 37 (2012)). Nor may it be used to "determine whether a particular rule of law is so widely

13 accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be

14 accepted as correct." Id. at 1451. Further, where courts of appeals have diverged in their

15 treatment of an issue, it cannot be said that there is "clearly established Federal law" governing

16 that issue. Carey v. Musladin, 549 U.S. 70, 76-77 (2006).

17 A state court decision is "contrary to" clearly established federal law if it applies a rule

18 contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

19 precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003)

20 (quoting Williams, 529 U.S. at 405-06). "Under the 'unreasonable application' clause of §

21 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct

22 governing legal principle from th[e] [Supreme] Court's decisions, but unreasonably applies that

23 principle to the facts of the prisoner's case.'" Lockyer v. Andrade, 538 U.S. 63, 75 (2003)

24 (quoting Williams, 529 U.S. at 413); Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). "[A]

25 federal habeas court may not issue the writ simply because that court concludes in its independent

26 judgment that the relevant state-court decision applied clearly established federal law erroneously

27 or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411;

28 see also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 ("It is not

8

enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous." (Internal citations and quotation marks omitted.)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

There are two ways a petitioner may satisfy subsection (d)(2). Hibbler v. Benedetti, 693 F.3d 1140, 1146 (9th Cir. 2012). He may show the state court's findings of fact "were not supported by substantial evidence in the state court record" or he may "challenge the fact-finding process itself on the ground it was deficient in some material way." Id. (citing Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004)); see also Hurles v. Ryan, 752 F.3d 768, 790-91 (9th Cir. 2014) (If a state court makes factual findings without an opportunity for the petitioner to present evidence, the fact-finding process may be deficient and the state court opinion may not be entitled to deference.). Under the "substantial evidence" test, the court asks whether "an appellate panel, applying the normal standards of appellate review," could reasonably conclude that the finding is supported by the record. Hibbler, 693 F.3d at 1146 (9th Cir. 2012).

The second test, whether the state court's fact-finding process is insufficient, requires the federal court to "be satisfied that any appellate court to whom the defect [in the state court's fact-finding process] is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." Hibbler, 693 F.3d at 1146-47 (quoting Lambert v. Blodgett, 393 F.3d 943, 972 (9th Cir. 2004)). The state court's failure to hold an evidentiary hearing does not automatically render its fact finding process unreasonable. Id. at 1147. Further, a state court may make factual findings without an evidentiary hearing if "the record conclusively establishes a fact or where petitioner's factual allegations are entirely without credibility." Perez v. Rosario, 459 F.3d 943, 951 (9th Cir. 2006) (citing Nunes v. Mueller, 350 F.3d 1045, 1055 (9th Cir. 2003)).

If a petitioner overcomes one of the hurdles posed by section 2254(d), this court reviews the merits of the claim de novo.  Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").  For the claims upon which petitioner seeks to present evidence, petitioner must meet the standards of 28 U.S.C. § 2254(e)(2) by showing that he has not "failed to develop the factual basis of [the] claim in State court proceedings" and by meeting the federal case law standards for the presentation of evidence in a federal habeas proceeding.  See Cullen v. Pinholster, 563 U.S. 170, 186 (2011).

The court looks to the last reasoned state court decision as the basis for the state court judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[I]f the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, [this court] may consider both decisions to 'fully ascertain the reasoning of the last decision.'"  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc) (quoting Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005)).  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  Richter, 562 U.S. at 99.  This presumption may be overcome by showing "there is reason to think some other explanation for the state court's decision is more likely."  Id. at 99-100 (citing Ylst, 501 U.S. at 803).  Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits.  Johnson v. Williams, 133 S. Ct. 1088, 1091 (2013).

A summary denial is presumed to be a denial on the merits of the petitioner's claims. Stancle v. Clay, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012).  Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under §

2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853 (citing Delgado v. Lewis, 223 F.3d 976, 981 (9th Cir. 2000)). This court "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e] [Supreme] Court." Richter, 562 U.S. at 102. The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

## PETITIONER'S CLAIMS

Petitioner raises five claims for relief: (1) there was insufficient evidence to convict him of aiding and abetting; (2) the gang expert's testimony was improper and counsel was ineffective for failing to object to it; (3) the prosecutor committed misconduct in closing argument and counsel was ineffective for failing to object it; (4) instructional error; and (5) the cumulative effect of all errors violated due process.

### I.      Sufficiency of the Evidence

Petitioner's first claim is that the evidence was insufficient to show he intended to aid and abet Jaime, the man in the bandana, or others in fighting or challenging someone to a fight. (Pet. (ECF No. 1 at 5-7, 46-55).)

#### A.   Applicable Legal Standards

##### 1.   Federal Standards for Sufficiency of the Evidence

The United States Supreme Court has held that when reviewing a sufficiency of the evidence claim, a court must determine whether, viewing the evidence and the inferences to be

drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  Id. at 326.  State law provides "for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law."  Coleman v. Johnson, 566 U.S. 650, 32 S. Ct. 2060, 2064 (2012) (quoting Jackson, 443 U.S. at 324 n.16).

The Supreme Court recognized that Jackson "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial.  A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury."  Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam).  Moreover, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may do so only if the state court decision was 'objectively unreasonable.'"  Id. (citing Renico v. Lett, 559 U.S. 766 (2010)). The Supreme Court cautioned that "[b]ecause rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold."  Id.

**2.  State Law Standards**

In California, a person who aids and abets a confederate in the commission of a criminal act is liable not only for that crime, the target crime, but also for any other offense that is a natural and probable consequence of the target crime.  See People v. Prettyman 14 Cal. 4th 248, 254, 261 (1996).  An aider and abettor is one who "act[s] with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense."  People v. Beeman, 35 Cal. 3d 547, 560 (1984) (emphasis in original); see People v. McCoy 25 Cal. 4th 1111, 1117-18 (2001).  In addition to the requisite

intent, an aider and abettor is only liable if he "by act or advice aids, promotes, encourages or instigates, the commission of the crime." Beeman, 35 Cal. 3d at 561. The act and the intent must be coupled. McCoy, 25 Cal. 4th at 1117 ("guilt is based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state" (emphasis in original)). "The test for an aider and abettor's liability for collateral criminal offenses . . . is objective; it is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted." People v. Nguyen, 21 Cal. App. 4th 518, 535 (1993).

Petitioner was convicted of aiding and abetting the crime of fighting or challenging to fight. Pursuant to California Penal Code §415(1), the crime is a misdemeanor defined as: "Any person who unlawfully fights in a public place or challenges another person in a public place to fight."

**B. State Court Decision**

> Defendant contends his murder conviction must be reversed because there was insufficient evidence he aided and abetted the target offense of fighting or challenging another person to fight (Pen.Code, § 415, subd. (1)).[fn 4] More specifically, defendant asserts "there was grossly insufficient evidence ... that [he] had knowledge of the perpetrator's purpose to commit the target offense, that [he] had the intent of at least encouraging or facilitating commission of the target crime and that [he] acted to aid, promote, encourage or instigate the commission of the crime."

> As we will explain, we disagree. Although the evidence was circumstantial, that evidence, when viewed in the light most favorable to the jury's verdict, was nonetheless sufficient to allow the jury to conclude three things beyond a reasonable doubt. First, the jury could have reasonably concluded that defendant aided, promoted, or encouraged his Norteño gang member friends to commit the offense of fighting or challenging another person to fight when he drove some of them by Guerrero's house, then dropped them off just down the block, from where they immediately proceeded to Guerrero's house for the confrontation that resulted in Guerrero's death. Second, the jury could have reasonably concluded that when defendant drove by Guerrero's house and dropped his cohorts off nearby, he knew they intended to pick a fight with Guerrero or with other persons at the house. And third, the jury could have reasonably concluded that when he drove by Guerrero's house and dropped his companions off, defendant intended to aid, encourage, or facilitate their commission of the crime of fighting or challenging another person to fight. Accordingly, the evidence was sufficient to convict defendant of

13

murder as an aider and abettor under the natural and probable consequences doctrine.

## A

### Standard Of Review

"Whether a person has aided and abetted in the commission of a crime ordinarily is a question of fact. [Citations.] Consequently, ' "all intendments are in favor of the judgment and a verdict will not be set aside unless the record clearly shows that upon no hypothesis whatsoever is there sufficient substantial evidence to support it." ' " (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094.)

" 'In determining whether a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, the appellate court "must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' [Citation.] The same standard also applies in cases in which the prosecution relies primarily on circumstantial evidence." (*People v. Young* (2005) 34 Cal.4th 1149, 1175, italics omitted.)

" ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*People v. Bean* (1988) 46 Cal.3d 919, 933.) " 'An appellate court must accept logical inferences that the [finder of fact] might have drawn from the circumstantial evidence.' " (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.)

"Circumstantial evidence is like a chain which link by link binds the defendant to a tenable finding of guilt. The strength of the links is for the trier of fact, but if there has been a conviction notwithstanding a missing link it is the duty of the reviewing court to reverse the conviction." (*People v. Redrick* (1961) 55 Cal.2d 282, 289–290.)

## B

### Aiding And Abetting Liability

"[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.)

"Except for strict liability offenses, every crime has two components: (1) an act or omission, sometimes called the actus reus; and (2) a necessary mental state, sometimes called the mens rea. [Citations.] This principle applies to aiding and abetting

14

liability as well as direct liability. An aider and abettor must do something and have a certain mental state." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) Thus, under the elements stated in *Beeman*, the "act" component of aiding and abetting consists of doing something that aids, promotes, encourages, or instigates the commission of a crime, while the "mental state" component consists of knowing the unlawful purpose of the perpetrator and intending to commit, encourage, or facilitate the commission of the offense.

Additionally, there must be a concurrence between the act and the mental state—that is, " 'the two elements of crime must be "brought together" in the sense of a causal relation between the mens rea and the actus reus. Stated in other words, the actus reus must be attributable to the mens rea....' " (*People v. Martinez* (1984) 150 Cal.App.3d 579, 602–603, disapproved on other grounds in *People v. Hayes* (1990) 52 Cal.3d 577, 628, fn. 10.)

Thus, to be guilty of a crime as an aider and abettor, the defendant must have engaged in the act that aided, promoted, encouraged, or instigated the commission of a crime by the perpetrator because he knew the unlawful purpose of the perpetrator and he intended to

commit the crime with the perpetrator or intended to encourage or facilitate the perpetrator's commission of the crime.

"[I]n general neither presence at the scene of a crime nor knowledge of, but failure to prevent it, is sufficient to establish aiding and abetting its commission. [Citations.] However, '[a]mong the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' " (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.)

C

The Natural And Probable Consequences Doctrine

"[A] defendant may be held criminally responsible as an accomplice not only for the crime he or she intended to aid and abet (the target crime), but also for any other crime that is the 'natural and probable consequence' of the target crime." (*People v. Prettyman* (1996) 14 Cal.4th 248, 261.)

"The test for an aider and abettor's liability for collateral criminal offenses ... is objective; it is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted." (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 535.) "In criminal law, as in tort law, to be reasonably foreseeable '[t]he consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough....' " (*Ibid.*) Furthermore, the test "is case specific, that is, it depends upon all of the facts and circumstances surrounding the particular defendant's conduct."

(*Ibid.*) "A reasonably foreseeable consequence is to be evaluated under all the factual circumstances of the individual case [citation] and is a factual situation to be resolved by the jury." (*People v. Medina* (2009) 46 Cal.4th 913, 920.)

D

Analysis

With the foregoing legal principles in mind, we turn to defendant's argument challenging the sufficiency of the evidence. Before we do so, however, we pause to set forth one more very important principle of law applicable to the issue before us. As we explained several years ago in *People v. Sanghera*, *supra*, 139 Cal.App.4th at pages 1573–1574: "Perhaps the most fundamental rule of appellate law is that the judgment challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error. [Citation.] Thus, when a criminal defendant claims on appeal that his conviction was based on insufficient evidence of one or more of the elements of the crime of which he was convicted, we must begin with the presumption that the evidence of those elements was sufficient, and the defendant bears the burden of convincing us otherwise.... [¶] ... [¶][T]o prevail on a sufficiency of the evidence argument, the defendant must present his case to us consistently with the substantial evidence standard of review. That is, the defendant must set forth in his opening brief all of the material evidence on the disputed elements of the crime in the light most favorable to the People, and then must persuade us that evidence cannot reasonably support the jury's verdict. [Citation.] If the defendant fails to present us with all the relevant evidence, or fails to present that evidence in the light most favorable to the People, then he cannot carry his burden of showing the evidence was insufficient because support for the jury's verdict may lie in the evidence he ignores."

In arguing that the evidence here was insufficient to find defendant aided and abetted the crime of fighting or challenging another person to fight, defendant's appellate counsel fails to heed our admonitions in *Sanghera*. For instance, counsel argues that "there was no evidence to support the premise that [defendant] drove by [the victim]'s house as part of an orchestrated plan to engage in a physical confrontation with Sure[ñ]os" and "[i]t appears rather that the Norte[ñ]os spotted [the victim] and his companions outside his house and then, on the spur-of-the-moment, they walked to the house when drunk and intending to confront [the victim]'s Sure[ñ]o stepsons." These arguments, however, do not account for all of the evidence that was presented and do not view that evidence in the light most favorable to the People, as we must do. When we view all of the evidence, consistent with the standard of review, the picture that emerges is far different than the one appellate counsel describes.

Viewed in the light most favorable to the jury's verdict, the evidence was sufficient to establish the following facts, which,

16

when considered in their totality, reasonably support defendant's conviction:

As previously noted, Guerrero's house was known in the Flats as being associated with the Sureños. Celica's son Federico, who was a validated Sureño, testified that he and his younger brother, Roberto, would sometimes wear blue clothing around the house, but another witness testified "[t]hey wore blue a lot" at Guerrero's house and yet another testified "they were always out in the front yard with blue stuff on" and it was "the only blue house in the neighborhood."

Before the shooting, defendant was far from a stranger to Guerrero and his "blue house." Celica had seen defendant arguing with her husband four times when her husband was at home. The arguments occurred because defendant and others he was with would "go by and burn tires and drive ... on the front yard," and Guerrero would tell them not to do that.

The evidence showed that Noe lived further down (to the west) on Lindley from Guerrero and Celica, at the corner of Lindley and Edgewater—across Lindley from Johnson Park. The evidence also showed that defendant and Noe were friends and that defendant would hang out in front of Noe's house. Also, there was a speed

bump on Lindley just to the west beyond Guerrero's driveway, i.e., on the way to Noe's.

In testifying about the arguments between her husband and defendant, Celica testified that when she "would go to the park [she] would see [defendant] with a lot of persons there and [at] another house that is on that side at the corner." She then testified that her husband and defendant "would argue because [defendant] would go by and burn tires and drive on the yard on the front yard. They would not make a stop, *all the people [who] went to that house including him.*" (Italics added.)

From this testimony, the jury reasonably could have found that defendant—who drove down Lindley "[a]lmost every day"—made it a practice of speeding by Guerrero's house and driving on Guerrero's yard—perhaps to drive around the speed bump—on his way to Noe's house. Guerrero objected to this practice. As Celica testified, "[t]here were many children around," and it was Guerrero's objection—"tell[ing] them not to do that"—that led to the arguments between defendant and Guerrero.

Beyond these general incidents, there was a specific incident between defendant and Guerrero about a month before the shooting. Celica was in her bedroom when her brother-in-law (who was visiting) came running in and said, " 'Celica, run. They are going to kill your children.' " Celica ran out into the yard, where she saw defendant, who was at the front of a large group of people, hit one of her sons' friends in the face, knocking him to the ground. Celica got Federico and Roberto into the house, while Guerrero told defendant and his companions to leave and that he was going to call the police. Guerrero then took out his cell phone and called the

police. Defendant stood and cursed at Guerrero, but then left with the group. Sometime during this incident, defendant was heard to say that he or they "owned the streets."

From the evidence, then, it was clear that by Memorial Day 2008 there was a history of conflict between defendant and the shooting victim.

On the morning of Memorial Day, just before noon, Miguel Balderas saw defendant hanging out in front of Noe's house with Noe, Pepe, Juan Carlos, Vargas, and Jaime. There was mention of a barbecue later that day at Pepe's house. Most of the group, except for Noe and defendant, left in the Chevelle. Balderas then gave defendant a ride home to a house on Arcade.

Later, in the evening, defendant was present at a barbecue at Jaime's house with Jaime, Hugo, Sergio, Pepe, Juan Carlos, and Vargas. They all decided to go to the Flats and left in at least two vehicles, headed to Noe's house.

Cell phone records showed that defendant's cell phone connected with Noe's cell phone for nearly a minute about an hour before the shooting. Within a span of four minutes just before 7:00 p.m., four connected calls were made from Noe's cell phone to Hugo's phone. Within 20 minutes after the shooting, four connected calls were made from defendant's cell phone to Noe's phone.

As detailed previously, the evidence also showed that around 7:00 p.m. defendant drove past Guerrero's house with some of the Norteño gang members in his car. One of them—probably Jaime, who was wearing a red bandana on his face—was leaning out the window flashing a Norteño gang sign. The car sped down Lindley, past the intersection with Edgewater, and out of sight. Moments later, however, the occupants of defendant's car were seen coming from Edgewater and turning up Lindley toward Guerrero's house, pulling up their pants and cinching their belts as if in preparation for a fight. They walked fast, with determination, and upon arrival at Guerrero's house, Jaime immediately called out for "the fucking Scraps," which referred to Celica's sons, one of whom was a validated Sureño. After Jaime threatened Guerrero with a gun, the fight ensued that led to Guerrero being shot to death by one of the Norteño gang members.

When interviewed by police after the shooting, defendant admitted picking up the bottle but claimed it was because he was "recycling." He claimed the Norteños were "not some people that I be around." Later, however, he claimed they "were drinking a little bit earlier." He then said, "That was it. I came back, I fucking parked." But then he immediately changed his story, saying, "I wasn't even driving.... [¶] ... [¶] I wasn't even driving my car that day." He later asserted he "was in the back seat of a car" and "[w]e came back. I fucking got out to go take a piss. And I don't know, man. I just fucking—I walked over to the fucking tree by Nicole's house, I stood there, I pissed, shit, and I turn around, motherfucker was gone. You know what I'm saying?" When the police asked who

was gone, defendant responded, "Motherfuckers was gone, man" and "Psh, people." Later in the interview, defendant changed his story again, saying, "I went and got beer, and fucking I came back. And that was, uh, fucking that."

Based on all of the foregoing facts, the jury could have drawn the reasonable inference that sometime on Memorial Day, the idea arose for the Norteños to go to Guerrero's house and confront the Sureños they knew (or believed) lived there, with whom defendant had previously had a number of arguments. Defendant helped carry out this plan by driving some of the Norteños by the house with Jaime leaning out the window with a red bandana on his face, flashing a gang sign as a provocation to the people at Guerrero's house. Defendant then dropped the Norteños in his car off at or near Noe's house, but did not accompany them to the confrontation. He did, however, make several cell phone calls to Noe shortly after the shooting, and he soon went to the place on Arcade where the fleeing Norteños had left a beer bottle when their car struck a tree trunk, picking up the bottle so the police could not get fingerprints.

Based on the evidence, the jury could have reasonably found that when he drove the Norteños by Guerrero's house and dropped them off nearby, defendant knew they intended to pick a fight with Guerrero or with other persons at the house and he intended to aid, promote, or encourage the commission of that offense by his actions. Accordingly, the evidence was sufficient to convict defendant of the murder of Guerrero under the natural and probable consequences doctrine because a reasonable person in defendant's position would have or should have known that murder was a reasonably foreseeable consequence of the confrontation he aided and abetted.

Defendant contends "it is not known why the Norte[ñ]os decided to go to Noe Ortiz's house on that Memorial Day" or "whether the Norte[ñ]os had decided to go to Guerrero's house when they left [Jaime's]." Defendant further contends "[i]t is pure speculation that a plan was hatched at [Jaime's]." Regardless of the exact time when they formed the plan, that there was a plan is reasonably inferable from all of the evidence. As we have explained, the evidence supports the conclusion that the Norteño gang members proceeded directly and with determination toward Guerrero's house the moment defendant dropped them off near Noe's after having driven them by Guerrero's house with Jaime issuing a gang challenge as they passed. This conduct is far more consistent with a planned confrontation than with a "spur-of-the[-]moment" decision, as defendant suggests.

Defendant contends "[t]here was no evidence [he] acted in any way to encourage the Norte[ñ]os to walk to Guerrero's house." Again, we disagree. He drove some of the Norteños past the house and dropped them off nearby, from where they immediately proceeded to the confrontation that resulted in Guerrero's death. The jury could infer from this—and the other evidence of defendant's connections with the Norteños and his history with Guerrero—that defendant knew of the confrontation that was to come and intended

to aid, promote, or encourage that confrontation by acting as their "transporter"—driving the Norteños past the house to scout the scene and initiate the challenge, then dropping them off nearby so they could make their way to the house.

Defendant argues that "[h]ad [he] been interested in [the Norteños'] venture, he would have" "walk[ed] down the block with [them]." That is an argument for a jury, not an appellate court. There is no way we can say, as a matter of law, that the only reasonable inference to be drawn from defendant's failure to join his Norteño friends in the actual confrontation is that he never intended to aid, promote, or encourage that confrontation. That was for the jury to decide, and we cannot say the jury acted without the benefit of substantial evidence in deciding that defendant intended to aid, promote, or encourage the confrontation even though he did not attend it.

We need not detail the remainder of defendant's arguments, which are all in the same vein. Suffice it to say that in making his arguments defendant refuses to consider all of the evidence against him, taken as a whole and viewed in the light most favorable to the jury's verdict. We, however, have done so, and for the reasons set forth above we conclude that the evidence was sufficient to support defendant's conviction.

> [fn 4] That statute makes it a misdemeanor for a person to "unlawfully fight[ ] in a public place or challenge[ ] another person in a public place to fight."

Armstrong, 2011 WL 3806154, at *4-11.

## C. Analysis of Sufficiency of the Evidence Claim

Petitioner was connected to the crime by the following facts: (1) he was seen with both Jaime and Noe, among others who were involved, on the day of the crime; (2) he drove by Guerrero's home shortly before the crime; (3) he had several Latino men in his car; (4) Jaime was in the front passenger seat and was wearing a red bandana across his face, leaning out of his car window, and flashing a Norteño gang sign at the people seated in Guerrero's driveway; (5) immediately after driving by Guerrero's home, petitioner dropped off Jaime, and possibly others, at or near the Ortiz home, just down the street from Guerrero's home; (6) petitioner was familiar with Guerrero and his stepsons; (7) Guerrero's stepsons were known to be Sureño gang members; (8) after the shooting, petitioner was driven to a location where others involved in the shooting left a beer bottle, which petitioner took; and (8) petitioner made and received multiple phone calls that day, both before and after the crime, from Noe Ortiz.

20

Petitioner contends there was no evidence he was, in fact, the driver of the car. He points to testimony that a witness thought the driver was Latino. He also argues that there was no evidence that, even if he was the driver, he knew his passengers intended to challenge or threaten Guerrero's stepsons. Petitioner focuses on the facts he was not in the group that walked to Guerrero's house so was not present during the altercation that lead to Guerrero's death and the lack of evidence that he was involved in any planning to threaten or challenge Guerrero's stepsons.

As the Court of Appeal points out, petitioner examines the evidence selectively. The state court recognized that the legal standard for a sufficiency of the evidence claim requires the court to consider the evidence in the light most favorable to the prosecution. In doing so here, this court finds evidence supporting (1) the identification of petitioner as being involved that day with the men who went to Guerrero's home, (2) a reasonable inference that petitioner knew the men intended to challenge or threaten Guerrero's stepsons, and (3) a finding that petitioner helped the men by driving them by Guerrero's home and dropping them off nearby.

First, evidence was presented showing that petitioner was seen in the company of Jaime, a Norteño gang member and his passenger with the red bandana, and of Noe, a Norteño associate, on the day of the crime. (See 2 RT 524-25; 4 RT 1167; 6 RT 1506.) Christian Lopez, the teenager sitting in Guerrero's driveway with Guerrero and others, testified that he saw a blue car, which he identified as a Taurus or Buick, drive by on the afternoon of the crime.[4] A man in the front passenger seat had a red bandana covering his mouth and nose. That man was leaning out of the car and flashing a Norteño gang sign. (2 RT 441-444.) Luis Cabrera, who lived on Lindley Drive, a short distance from Guerrero's house, saw a blue Chevy Lumina, that he identified as petitioner's car, drive by that evening with a Latino man hanging out the front passenger window, wearing a "red rag" over his face, and "throwing gang signs." (3 RT 678-681.) Cabrera could not identify the driver of the car but could see that it was a Black man. (3

---

[4] Christian testified that the car drove by in the afternoon and that men came back 10 or 15 minutes later, resulting in the shooting. (2 RT 438, 446.) However, the shooting occurred in the evening, around 7:00 p.m., so Christian's estimate of the time the car drove by was obviously incorrect.

RT 679.)  Cabrera had seen petitioner driving the car many times and had never seen anyone else drive it.  (3 RT 680.)  Petitioner's girlfriend, Kenisha Ramsey, also testified that petitioner was the only one who drove his car.  (4 RT 1199.)

Second, evidence showed that petitioner dropped off Jaime, and possibly others, around the intersection of Lindley and Edgewater, near Noe Ortiz's home.  Cabrera testified that just seconds after he saw petitioner's car go by, and disappear around a corner, he saw four or five men walking down the street from that direction.  One of the men was the man with the bandana who had been in petitioner's car.  (3 RT 687.)  Christian Lopez also testified that not long after he saw the blue car drive by, he saw men walking down the street towards Guerrero's house.  One of the men he identified as the man with the red bandana from the blue car.  (2 RT 453, 455-456.)

Third, the men walking towards Guerrero's house appeared to be preparing for a fight.  Both Cabrera and Christina Gutierrez, who also lived nearby and saw the men walk towards Guerrero's house, testified that they thought the men were getting ready to fight.  Cabrera testified that the men were "tying up their belts" and "pulling up their pants" like they were getting ready to fight.  (3 RT 693.)  Gutierrez testified that it was unusual to see these men walking in this area, they were walking quickly, and they looked mad. (2 RT 623-26.)  She thought they were going to get in a fight.  (2 RT 623.)

Finally, the evidence that petitioner picked up the beer bottle after it was left by the group of men who fled the scene identifies him as being part of the group.  Casey Rhoads, a resident on Arcade Boulevard, saw the two-tone Chevelle become stuck on a tree stump in the road.  (4 RT 933-35.)  She watched the men exit the vehicle and try to dislodge the stump.  She saw that two men who got out of the front seat were holding large beer bottles.  One man placed a beer bottle on the ground.  (4 RT 941-42.)  As the car was driving away, one of the men threw a beer bottle through the car window and it shattered against a wall.  (4 RT 945-46.)

Shortly after the vehicle drove off, two police cars came by.  The officer in the second car asked another Arcade Boulevard resident, Desiree Moore, to keep an eye on the bottle, which was apparently lying on the sidewalk.  (4 RT 1044.)  Five or ten minutes later, a black SUV pulled up

////

and stopped in the street. Moore heard a voice in the car say, "Get that bottle so they can't get any prints off it." She saw a Black man get out of the car and grab the bottle. (4 RT 1097-98.)

Tyrone Johnson testified that he was in the SUV with petitioner and others. While driving down Arcade, the car stopped, petitioner jumped out of the car and grabbed a beer bottle. (3 RT 865-66.) A Sacramento Police Detective, Jason Kirtland, testified that shortly after the crime he interviewed Jamar Brewer who told him he was also in the SUV with petitioner and Tyrone Johnson. Brewer told Kirtland that petitioner was the one who told the driver to stop the car so that he could pick up the beer bottle. (5 RT 1450-51.) Kirtland also interviewed Tyrone Johnson the same day. Johnson also told him petitioner was the one who told the driver to stop the car. (5 RT 1457.)

The Court of Appeal decision finding sufficient evidence supported the aiding and abetting verdict against petitioner was not objectively unreasonable. Evidence showed that petitioner supported the actions of Jaime and, most likely, others in instigating a fight with Guerrero's stepsons by driving them past Guerrero's house and stopping nearby to allow them to walk back to the house and confront Guerrero. The fact that Jaime and the others started preparing for a fight immediately after they got out of petitioner's car was sufficient evidence for a reasonable jury to find that petitioner knew they intended to instigate a fight with Guerrero's stepsons and intended to help them in doing so.

## II.      Improper Testimony from Gang Expert/Ineffective Assistance of Counsel

Petitioner's next claim is that the prosecution's gang expert, Detective John Sample, improperly opined that petitioner acted with the intent to assist the Norteño gang in its criminal enterprises. (Pet. (ECF No. 1 at 9-11, 55-64).) Petitioner further argues that his attorney rendered ineffective assistance by failing to object to this testimony. (Id. at 64-69.)

In his state appellate brief, petitioner made these same two claims. However, in his petition for review to the California Supreme Court, petitioner argued only that his counsel was ineffective for failing to object to the gang expert testimony. (See LD 18.) This limitation on his claim is unsurprising. Because he did not raise the issue at trial, California's contemporaneous objection rule would bar appellate review of the issue. Respondent raised the default of the issue

in his state court appellate brief.  (See Resp't's Brief ("RB") (LD 16) at 29.)  And, the Court of Appeal's decision addresses only the ineffective assistance of counsel issue.  Armstrong, 2011 WL 3806154, at *14-15.

This court may only consider claims that have been exhausted in state court.  See 28 U.S.C. § 2254 (b)(1).  In order to satisfy the federal exhaustion requirement, a state prisoner must fairly present all of his federal claims to the state's highest court before he presents them to the federal court.  Duncan v. Henry, 513 U.S. 364, 365 (1995) (per curiam); Picard v. Connor, 404 U.S. 270, 276 (1971); Middleton v. Cupp, 768 F.2d 1083, 1086 (9th Cir. 1985).  In California, a federal claim is fairly presented to the state's highest court only by presenting the claim to the California Supreme Court either on direct appeal or in a habeas petition that describes the operative facts and the legal theories upon which the claim is based.  Picard, 404 U.S. at 277-78.

Because petitioner did not raise his claim of improper gang testimony in his petition for review to the California Supreme Court, it is not exhausted and will not be considered here.  This court considers only petitioner's claim of ineffective assistance of counsel for failure to object to the gang expert testimony.

### A.  Applicable Legal Standards

To succeed on a claim of ineffective assistance of counsel, a petitioner must show that (1) his counsel's performance was deficient and that (2) the "deficient performance prejudiced the defense."  Strickland v. Washington, 466 U.S. 668, 687 (1984).  Counsel is constitutionally deficient if his or her representation "fell below an objective standard of reasonableness" such that it was outside "the range of competence demanded of attorneys in criminal cases."  Id. at 687–88 (internal quotation marks omitted).  "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'"  Harrington v. Richter, 562 U.S. 86, 104 (2011) (quoting Strickland, 466 U.S. at 687).

A reviewing court is required to make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Strickland, 466 U.S. at 669; see Richter, 562 U.S. at 107.  Reviewing courts must also "indulge a strong presumption that counsel's conduct

24

falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.

This presumption of reasonableness means that the court must "give the attorneys the benefit of the doubt," and must also "affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as they did." Cullen v. Pinholster, 563 U.S. 170, 195 (2011) (internal quotation marks and alterations omitted).

Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. "The likelihood of a different result must be substantial, not just conceivable." Richter, 562 U.S. at 112. A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697), amended and superseded on other grounds, 385 F.3d 1247 (9th Cir. 2004); United States v. Ray, No. 2:11-cr-0216-MCE, 2016 WL 146177, at *5 (E.D. Cal. Jan. 13, 2016) (citing Pizzuto, 280 F.3d at 954).

**B. Factual Background**

Petitioner challenges counsel's failure to object to the following testimony by Detective Sample:

> Q. So this will be the last thing that I am going to talk to you about regarding hypotheticals. Let's assume that this person who we're going to call Tony who drove, let's assume, that he drove by the victim's house, the Sureno house just minutes before there was going to be a shooting there.
>
> A. Okay.
>
> Q. And that he is driving a blue Lumina.
>
> A. Okay.
>
> Q. And he's also allowing his right front passenger who is a male Hispanic to lean out the right front passenger window while wearing a red rag and while allowing that person to make gang signs as they drive down the street, okay. Do you have that in your head?

25

A.  This is making gang signs to the same location.

Q.  So they are driving down the street called Lindley, driving down the street, right front passenger is making gang signs but not also to the Sureno house but other victims as they drive down the street.

A.  Got you.

Q.  Assume that person – we're going to call this person Tony.  Assume that a witness who saw that car driving down the street later identified to police that was, in fact, Tony's car.

A.  Okay.

Q.  Assume that Tony claims to not hang out with any Mexicans.

A.  Okay.

Q.  Assume this person Tony claims does not know anybody that goes by the name Noe.

A.  Okay.

Q.  Assume that cell phone records show twenty plus phone calls back and forth in one day between this person Tony and this person Noe, both before and after the shooting.

Assume that this two-tone Chevelle hits this tree stump where one of these occupants left the beer bottle.  And assume that minutes after that happened, this person who we'll call Tony, stopped at that scene where the tree stump was and told the drive to stop the car and then this person, Tony, got out and picked up the beer bottle.  And assume that witnesses overheard somebody in that group yell out the phrase, "Get the bottle so they can't get any prints."

Assume that witnesses have named Tony as the person who got the bottle.  Assuming those facts, do you have those facts in your head?

Yes.

Q.  Do you have an opinion on whether or not this person Tony did an act for the benefit of or in association with the Nortenos?

A.  Yes.

Q.  And what's that opinion?

A.  That Tony did commit an act both again in benefit of the Norteno gang as well as in association with the Norteno gang.

Q.  And why do you say that?

A.  The scenario you gave to start with has Tony driving a Norteno in his car past a Sureno house with the Norteno throwing gang signs at that house.

Q.  Does that benefit – does that not only benefit the Nortenos, but is something done in association with Nortenos?

A.  That is both in association with the fact that he is with actually physically with the Norteno in his car, but it's obviously benefiting him by driving past this location.  It benefits the Nortenos too.  This person is part of the fact this intimidating gesture throwing gang signs out and wearing gang colors.  Benefits the gang again adding to reputation for not only ruthlessness but the threats that are going out there.

Q.  Does it do anything else in that scenario either benefits the Nortenos or is something that is done in association with Nortenos?

A.  Yes, it appears that he's made phone contact.  He said he made phone contact.  First, he denied knowing the person named Noe, but then there is phone contact with this person named Noe, who is in this other car that had left the scene with the original person with the mask, you said was Jaime who is a Norteno.

Noe was with this Norteno named Jaime and left in the other car with the other group with Norteno named Jaime.

Q.  Let me clarify something in this hypo.  Let's assume Noe didn't leave in the car.  Let's assume Noe stayed in his house which is at the intersection of Lindley and Edgewater, does that alter your opinion at all?

A.  No, I guess I was following the first one.

Q.  That's okay.

A.  But Noe made the phone call to Tony.  A phone call to Tony, you said there was phone calls back and forth.  After that Tony drove to pickup a bottle left behind by this two-tone car which was out at the crime scene.  And somebody in Tony's group said something about picking up the bottle so they don't get prints on it.  That would benefit the Nortenos by picking up that evidence from the crime scene, obviously, to avoid the Nortenos being involved with the prosecution or identification of the crime that was just committed.

Q.  Do you have a further opinion on whether or not this person Tony did any of those acts with the specific intent to promote further or assist the Nortenos in their criminal behavior?

A.  Yes.

Q.  And what's that opinion?

A.  They – he did – had a specific intent to both promote and assist

27

the Nortenos. The first part of promotion was the fact that he both promoted and assisted the subject called – he said the person with the red mask in the car or with the red – we'll call Norteno. He promoted and assisted him driving by and putting the initial response out there with the gang signs and the red mask on which again assisted with the threats and with the fear and intimidation that Sureno and the community is going to feel.

The second part of going and getting the bottle also assisted Nortenos by taking that evidence away from the crime scene. Investigators most likely would not be able to identify the perpetrators involved, those being Nortenos.

(6 RT 1662-1664.)

## C.  State Court Decision

Defendant contends his trial attorney was ineffective because he failed to object to the testimony of the prosecution's gang expert in response to "a so-called hypothetical that used [defendant]'s name and summarized the prosecution's evidence." According to defendant, "[t]his testimony crossed over the line into impermissible expert testimony by using improper hypothetical questions to opine as to [defendant]'s mindset."

Near the end of the direct examination of the gang expert, Sacramento Police Detective John Sample, the prosecutor asked an extended hypothetical question that incorporated specific details of the case, including defendant's name ("Tony"), the type of car he drove ("a blue Lumina"), and the name of the street ("Lindley"). Based on that hypothetical, the prosecutor asked Detective Sample if he had "an opinion on whether or not this person Tony did an act for the benefit of or in association with the Norte[ñ]os?" Detective Sample testified that he had an opinion and it was "[t]hat Tony did commit an act both again in benefit of the Norte[ñ]o gang as well as in association with the Norte[ñ]o gang." Detective Sample then offered the reasons for his opinion. The detective then testified as to his opinion that "Tony" "had a specific intent to both promote and assist the Norte[ñ]os." Defense counsel did not object.

Defendant contends Detective Sample's expression of his opinion that "Tony" acted for the benefit of or in association with the Norteños and with the specific intent to promote and assist the Norteños violated recognized limits on gang expert testimony identified in *People v. Killebrew* (2003) 103 Cal.App.4th 644.6 In *Killebrew*, "a ... police officer who testified as an expert witness on gangs, [was allowed] to give an opinion about the intent and knowledge of gang members when in the presence of guns." (*Id.* at p. 650.) Specifically, "[t]hrough the use of hypothetical questions, [the officer testified] that each of the individuals in the three cars (1) knew there was a gun in the Chevrolet and a gun in the Mazda, and (2) jointly possessed the gun with every other person in all three cars for their mutual protection. In other words, [the officer] testified to the subjective knowledge and intent of each occupant in

28

each vehicle." (*Id.* at pp. 650, 658.) Because the officer's "testimony was the only evidence offered by the People to establish the elements of the crime," it was "the type of opinion that did nothing more than inform the jury how [the officer] believed the case should be decided," and thus "[i]t was an improper opinion on the ultimate issue and should have been excluded." (*Id.* at p. 658.)

In an attempt to bring this case closer to *Killebrew*, defendant contends that Detective Sample's testimony as to his opinion that "Tony" acted for the benefit of or in association with the Norteños and with the specific intent to promote and assist the Norteños was, "[i]n effect, ... testimony that [defendant] aided and abetted the crime, for [defendant] could not be acting in association with them and to benefit them and to promote the crime without aiding and abetting the crime." Thus, in defendant's view, "Detective Sample expressed his opinion as to how the jury should decide the case," which is impermissible.

"Expert opinions which invade the province of the jury are not excluded because they embrace an ultimate issue, but because they are not helpful (or perhaps too helpful). '[T]he rationale for admitting opinion testimony is that it will assist the jury in reaching a conclusion called for by the case. "Where the jury is just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions, then the need for expert testimony evaporates." [Citation.]' [Citations.] In other words, when an expert's opinion amounts to nothing more than an expression of his or her belief on how a case should be decided, it does not aid the jurors, it supplants them." (*Summers v. A.L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1183.)

Keeping in mind that the question before us is not whether Detective Sample's testimony that "Tony" acted for the benefit of or in association with the Norteños and with the specific intent to promote and assist the Norteños should have been excluded, but whether defense counsel's failure to object to that testimony fell below an objective standard of reasonableness and whether it is reasonably probable the verdict would have been different if defense counsel had objected, we conclude defendant has failed to make the requisite showing. "Failure to object rarely constitutes constitutionally ineffective legal representation...." (*People v. Boyette* (2002) 29 Cal.4th 381, 424.) Moreover, in this specific context, even *Killebrew* held that "[a] bright line cannot be drawn to determine when opinions that encompass the ultimate fact in the case are or are not admissible" and "[t]he issue has long been a subject of debate." (*People v. Killebrew, supra,* 103 Cal.App.4th at pp. 651–652.) " '[T]he true rule is that admissibility depends on the nature of the issue and the circumstances of the case, there being a large element of judicial discretion involved.' " (*Id.* at p. 652, quoting *People v. Wilson* (1944) 25 Cal.2d 341, 349.) Under the circumstances here, defendant cannot show that had his trial counsel objected to Detective Sample's opinion testimony the trial court would have excluded it. (*See People v. Roberts* (2010) 184 Cal.App.4th 1149, 1194.) Furthermore, we are not persuaded that had the evidence been excluded it is reasonably probable defendant

29

would have received a better result. Defendant himself admits "[t]hat the incident was gang-related was overwhelmingly proven by other evidence." Nor are we inclined to believe that Detective Sample's testimony that "Tony" acted for the benefit of or in association with the Norteños and with the specific intent to promote and assist the Norteños was, as defendant suggests, the evidence that tipped the scale on the jury's determination "of whether [defendant] had aided and abetted the Norte[ñ]os in their crime." Accordingly, we reject defendant's assertion of ineffective assistance based on defense counsel's failure to object to that evidence.

Armstrong, 2013 WL 3806154, at *14-15.

### D. Analysis of Ineffective Assistance of Counsel Claim re Gang Expert Testimony

The Court of Appeal considered only whether petitioner was prejudiced by any failure of his trial attorney to object to the gang evidence. It found no prejudice because it was not reasonably probable that, had counsel objected, the evidence would have been excluded under state law. The court further found that even had the evidence been excluded, there was no reasonable probability the result of petitioner's trial would have been different.

Initially, to the extent the Court of Appeal decision rested on a conclusion that Detective Sample's testimony would not have been excluded under state law, that decision may not be reconsidered by this court. This court is bound by the state court's determination of its own laws. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); see also Mullaney v. Wilbur, 421 U.S. 684, 691 (1975) ("state courts are the ultimate expositors of state law").

It is also worth noting that the Court of Appeals for the Ninth Circuit has held that admitting a gang expert's testimony that a hypothetical crime was committed for the benefit of a criminal street gang was not contrary to, or an unreasonable application of, clearly established federal law. Briceno v. Scribner, 555 F.3d 1069, 1076-77 (9th Cir. 2009). Even assuming the evidence was excluded, this court finds no reasonable probability the result of the proceeding would have been different for two reasons. First, the evidence itself did not substantially effect the verdict. And, second, even without the gang expert testimony, there was significant evidence upon which a jury

////

30

could reasonably have found petitioner intended to aid and abet the crime of fighting or challenging to a fight.

With respect to the first point, the gang expert evidence was not a lynch pin to petitioner's conviction of aiding and abetting the crime of fighting. Detective Sample's testimony tied petitioner's actions to Norteño gang activities. Yet, there was ample other evidence of gang involvement in this case. In fact, the prosecution's theory of the case was that Guerrero's house was targeted by Norteño gang members because Guerrero's stepsons were members of the Sureño gang. Testimony showed that the red bandana worn by Jaime, the passenger in petitioner's car, was a sign of Norteño membership and that Jaime flashed a hand sign representing the Norteños.

The purpose of the gang expert's testimony was to support the gang enhancement. However, as stated above, while the jury found the gang enhancement true, it was not included in the judgment under Cal. Penal Code § 12022.53(e)(2). Therefore, its exclusion would have been relevant to the enhancement rather than to petitioner's conviction of the underlying crime. The expert's testimony had only an attenuated relationship to the underlying crime. The expert testified that petitioner's actions showed he was assisting the Norteño gang. That opinion was not an ultimate fact to be determined in this case for the crime charged. The jury was instructed that it had to determine whether petitioner intended to act to support the perpetrator's intent to commit the crime of fighting or challenging to a fight. (7 RT 1905.)

To address petitioner's argument that the expert's hypotheticals were particularly prejudicial because they used petitioner's name, courts have held that an expert's use of a defendant's name is not, per se, a violation of due process. See Falcon v. Davis, No. CV 15-1215-PA (AGR), 2016 WL 2940535, at *10 (C.D. Cal. Apr. 5, 2016) (fact that the petitioner's name used in hypothetical did not "'so infuse the trial with unfairness as to deny due process of law'" (quoting Estelle v. McGuire, 502 U.S. 62, 75 (1991)), report or reco. adopted, 2016 WL 2930698 (C.D. Cal. May 17, 2017). Further, the expert's conclusion from the hypothetical was that petitioner was assisting the Norteño gang members in intimidating people at the Sureño house. (See 6 RT 1665-66.) He did not conclude that petitioner would have known the Norteños intended to fight or challenge to a
////

fight.  In other words, his testimony did not establish the specific intent necessary to show

petitioner aided and abetted the Norteños in fighting or challenging to fight.

Finally, the court notes that the jury was instructed to regard Detective Sample's

testimony as not establishing the facts underlying his opinion.  Specifically, the jury was told,

> Witnesses were allowed to testify as experts and to give opinions.  You may consider the opinions, but you are not required to accept them as true or accurate.  The meaning and importance of any opinion are for you to decide.  In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally.

> In addition, consider the expert's knowledge, skill, experience, training and education, the reasons the expert gave for any opinion and the facts or information on which the expert relied in reaching that opinion.

> You must decide whether information on which the expert relied was true and accurate.  You may disregard any opinion that you find unbelievable, unreasonable or unsupported by the evidence.

> An expert witness may be asked a hypothetical question.  A hypothetical question asks the witness to assume certain facts are true and to give an opinion based on the assumed facts.

> It's up to you to decide whether an assumed fact has been proved.  If you conclude that an assumed fact is not true, consider the effect of an expert's reliance on that fact in evaluating the expert's opinion.

(7 RT 1898.)  In addition, the jury was told that it could consider the evidence of gang activity

"only for the limited purpose of deciding whether the defendant acted with the intent, purpose and

knowledge that are required to prove gang related crimes and enhancements charged or the

defendant had a motive to commit the crimes charged."  (7 RT 1895.)  The court presumes the

jury followed the instructions given.  See Weeks v. Angelone, 528 U.S. 225, 226 (2000).

As set forth in the prior section, there was substantial evidence to support petitioner's

conviction for aiding and abetting fighting without consideration of the gang expert's testimony.

This court finds reasonable the state Court of Appeal's holding that even had the evidence been

excluded, there is no reasonable probability the result of the proceeding would have been

different.

////

### III.    Prosecutorial Misconduct/Ineffective Assistance of Counsel

In closing, the prosecutor argued that courts had held murder is a natural and probable consequence of a fist fight.[5]  Petitioner argues the prosecutor committed misconduct by referring to matters not in evidence and by placing the authority of the courts behind a determination that the jury had to make.  Petitioner further argues that his counsel was ineffective for failing to object to this argument.  (Pet. (ECF No. 1 at 12-14, 69-79).)

Again, because petitioner's attorney failed to object to this argument at trial, the Court of Appeal addressed only petitioner's ineffective assistance of counsel claim.  And, again, in his petition for review to the California Supreme Court, petitioner's argued only ineffective assistance of counsel.  Therefore, that is the only aspect of this claim which is exhausted and the only aspect this court may address.

### A.    State Court Decision

> Defendant contends his trial counsel was ineffective because he failed to object to prosecutorial misconduct in closing argument. Specifically, he complains that "[t]he prosecutor argued that if [defendant] aided and abetted the fistfight, he was guilty of murder because the authoritative body of the courts had said so," and his trial attorney "failed to object to this argument until too late."
>
> In arguing his case to the jury, the prosecutor told the jury, "There are three things I get to argue in every case. I get to argue the law which is kind of what we've been talking about. I get to argue about the evidence, and I get to argue common sense." After briefly addressing common sense and the evidence (specifically, some of Detective Sample's testimony), the prosecutor finished with "the law," arguing as follows: "Some time ago there was an old California case called People versus Butts.[fn 7] And this case was back in 1965, and this case said that murder is never a natural probable consequence of a fistfight. You just can't have it. So that was the court back in 1965.[¶] Well, the Court's have changed with the times. They've kind of caught up with society. And 34 years later in 1999, there was a case call[ed] Montez.[fn 8] I am going to quote a couple of sentences." At that point, defense counsel interrupted, and a unreported discussion occurred. After that discussion, the prosecutor resumed his argument as follows: "So, we got this court back in 1965, that says a fistfight is never a natural and probable consequence of murder. What I am going to tell you now is the courts have changed their stance, and the courts have totally done away with that line of thinking because they have

---

[5] The prosecutor's specific argument is set out in the Court of Appeal opinion below.

caught up with society, and have recognized that murder is a natural and probable consequence of a fistfight. And that's common sense. Common sense tells you that. The evidence tells you that based on the expert who is uncontroverted and the law tells you that. [¶] So whether the plan here was just to go fight some rivals, you know the outcome was much different. It was much different, but it was not unexpected. Murder was foreseeable. You know it. Detective Sample knows it and the courts know it."

After the prosecutor finished his initial argument, outside the presence of the jury the trial court noted that defense counsel had "asked that the District Attorney be prohibited from reading an excerpt from this case and I sustained that objection" because "the passage selected had a factual character to it that was inappropriate."[fn 9] Defense counsel then added the following: "One brief comment because I didn't get to articulate it. It wasn't just the reading of the passage. It was some of the argument in which he essentially said the [courts] have found that murder is [the] natural [and] probable consequence of a fistfight that is the province of that jury. I think it improper. It is improper to tell this jury that has been decided, that was a suggestion." The court responded that "at sidebar that argument was not articulated or objection was not articulated. The one that was the objection with regard to the reading. I sustained that objection. The District Attorney complied then with my order, request not to—not to read it.[¶] And I didn't address this other issue because it was not raised at that time and it is not raised now in the sense of asking for action." When defense counsel responded, "True," the court closed with, "So I treat it as an observation."

 On appeal, defendant contends his attorney was ineffective in failing to make a timely objection that encompassed not only the prosecutor's intended reading from the *Montes* decision but also the prosecutor's representation to the jury that "the courts ... have recognized that murder is a natural and probable consequence of a fistfight." In defendant's view, the prosecutor misstated the law by "telling the jury that as a matter of law, murder is a natural and probable consequence of a fistfight in all cases, when the issue is a fact-specific determination to be made by the jury based on the individual facts of the case."

"Although counsel have broad discretion in discussing the legal and factual merits of a case [citation], it is improper to misstate the law...." (*People v. Bell* (1989) 49 Cal.3d 502, 538.) To the extent the prosecutor could be understood to argue that, following *Montes*, the courts have recognized that murder is always a natural and probable consequence of a fistfight, that was an improper misstatement of the law. As we have previously noted, whether one offense is a natural and probable consequence of another is a "case specific" inquiry that "depends upon all of the facts and circumstances surrounding the particular defendant's conduct." (*People v. Nguyen*, supra, 21 Cal.App.4th at p. 535.)

In light of defense counsel's closing argument to the jury, however, we cannot conclude that his conduct, viewed as a whole, fell below

an objective standard of reasonableness, nor can we conclude that it is reasonably probable defendant would have received a better result if defense counsel had offered a complete contemporaneous objection to the prosecutor's argument. This is so because, as the People point out, defense counsel effectively addressed this aspect of the prosecutor's argument in his own closing. Specifically, defense counsel argued, "Yes, disturbing the peace can result in shooting. No, it is not a natural likely and probable consequence." He then turned directly to the prosecutor's previous assertions based on *Montes*:

"I mean, in his argument, unless I misunderstood him, I thought [the prosecutor] was trying to say that, hey, it has been found that shootings are [a] likely consequence of disturbing the peace.

"Okay. Well, there is only one person in this courtroom who is going to give you the law, and it isn't him, and it isn't me. It is Judge Connelly. And he's not going to tell you that. So you ask yourself this question, if you get to the point and I don't think you can or will, but if you get to the point where you think that Tony Armstrong was in that car in that Lumina, he had planned and assisted in this whatever challenge disturbance of the [peace], if you get to that point, you have to ask yourself: Is it likely? Is it a natural and probable consequence that kind of challenge will result in a shooting death? Not can it. Not might it. Not did it. But is it a natural and probable result? Would an objective person in that setting expect that's what will lead, the answer to that question is no."

Subsequently, the trial court instructed the jury, "You must follow the law as I explain it to you even if you disagree with it. If you believe the attorneys' comments on the law conflict with my instructions, you must follow my instructions." Thereafter, the court instructed the jury that "[t]o prove that the defendant is guilty of murder as an aider and abettor, the People must prove that: [¶] ... [¶] ... [u]nder all of the circumstances a reasonable person in the defendant's position would have known that the commission of the murder was a natural and probable consequence of the commission of the fighting or challenging to fight" and that "[i]n deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence."

In assessing whether defense counsel's conduct was unreasonable, we refuse to view his failure to offer a complete contemporaneous objection to the prosecutor's argument in isolation from the thorough response he offered in his own closing. When defense counsel's conduct in closing is viewed as a whole, it is plain that he performed more than adequately. Moreover, given the instructions the trial court gave—which we presume the jury followed (*People v.. Boyette*, *supra*, 29 Cal.4th at p. 453)—we can find no reasonable probability that, based on what the prosecutor had earlier argued with respect to the *Montes* decision, the jury misunderstood the natural and probable consequences doctrine and believed that murder is always to be treated as a natural and probable consequence of a fistfight. Accordingly, we reject defendant's

assertion of ineffective assistance based on the prosecutor's closing argument.

> [fn 7] *People v. Butts* (1965) 236 Cal.App.2d 817.
>
> [fn 8] *People v. Montes* (1999) 7 Cal.App.4th 1050.
>
> [fn 9] It is most likely the prosecutor wanted to read the following passage: "*Butts* is also more than three decades old, a remnant of a different social era, when street fighters commonly relied on fists alone to settle disputes. Unfortunately, as this case illustrates, the nature of modern gang warfare is quite different. When rival gangs clash today, verbal taunting can quickly give way to physical violence and gunfire. No one immersed in the gang culture is unaware of these realities, and we see no reason the courts should turn a blind eye to them." (*People v. Montes*, *supra*, 74 Cal.App.4th at p. 1056.)

<u>Armstrong</u>, 2011 WL 3806154, at *16-18.

**B.   Analysis of Ineffective Assistance of Counsel re Prosecutorial Misconduct**

Petitioner stresses the severity of the prosecutor's misconduct here.  In addition to making jurors think that whether murder was a natural and probable consequence of fighting was not a determination for them to make, the prosecutor's comments made irrelevant the fact that there was no evidence petitioner knew anyone had a gun.  This court agrees.  There is no question the prosecutor's argument was improper.  The questions are whether counsel's conduct was unreasonable and whether his failure to object caused petitioner prejudice.

It was not unreasonable for the Court of Appeal to find no reasonable probability that had the prosecutor's comments been cut off and an instruction immediately given to disregard them, the result of the proceedings would have been different.  As the Court of Appeal noted in <u>Montes</u>, it would be reasonable to think escalated violence, including murder, was a natural and probable consequence of a gang fight.  74 Cal. App. 4th at 1056.  Significantly, the Court of Appeal in that case found the fact that the defendant was unaware the perpetrator had a gun was not decisive.  The court found, "Given the great potential for escalating violence during gang confrontations, it is immaterial whether [defendant] Montes specifically knew [perpetrator] Cuevas had a gun."  <u>Id.</u>  The jury heard the gang expert testify about the significant and serious gang violence in Sacramento.  He testified that weapons had become more prevalent in Hispanic gangs in

36

Sacramento.  (6 RT 1625-26.)  Jurors could reasonably have found, without the prosecutor's

comments, that based on the evidence before them, murder was a foreseeable and probable

consequence of gang members heading to a rival gang member's house for a fight.

Further, the prosecutor's comments were neutralized both by trial counsel's argument,

described above by the Court of Appeal, and by the court's instructions to the jury.  Jurors were

told that to find petitioner guilty of murder, the prosecution had to prove:  (1) petitioner was

guilty of aiding and abetting a fight or challenge to a fight; (2) during the fight or challenge to a

fight, a co-participant committed the crime of murder; and (3) "[u]nder all of the circumstances a

reasonable person in the defendant's position would have known that the commission of the

murder was a natural and probably consequence of the commission of the fighting or challenging

to fight."  (7 RT 1906.)

The court defined a "natural and probable consequence" as follows:

> . . .  A natural and probable consequence is one that a reasonable
> person would know is likely to happen if nothing unusual
> intervenes.
>
> In deciding whether a consequence is natural and probable,
> consider all of the circumstances established by the evidence.  If the
> murder was committed for a reason independent to the common
> plan to commit the fighting or challenging to fight, then the
> commission of murder was not a natural and probable consequence
> of fighting or challenging to fight.

(7 RT 1906-1907.)

The trial court also told the jurors that to determine the facts of this case, they

> must use only the evidence that was presented in this courtroom.
> Evidence is the sworn testimony of the witnesses, the exhibits
> admitted into evidence and anything else I told you to consider as
> evidence.  Nothing that the attorneys say is evidence.  In their
> opening statements and closing arguments, the attorneys discussed
> the case but their remarks are not evidence.  Their questions are not
> evidence.  Only the witness's answers are evidence.

(7 RT 1890.)

On this record, the Court of Appeal's holding that counsel's failure to object at trial did

not cause petitioner prejudice was not contrary to, or an unreasonable application of, clearly

established federal law.

37

**IV.    Instructional Error**

Petitioner repeats here the argument made in his appeal that the jury instruction on the natural and probable consequences doctrine was improper.  (Pet. (ECF No. 1 at 16-17, 79-92).) Petitioner was successful on this issue on appeal and his murder conviction was reduced to second degree.  See Armstrong, 2011 WL 3806154, at *11-14.  Therefore, petitioner's claim is moot.  To the extent petitioner is arguing that the error in the instructions justified a new trial, not just a reduction in the convicted offense, petitioner did not raise that issue in his petition for review in the California Supreme Court.  (See Traverse (ECF No. 21-1 at 23).)  Therefore, it is unexhausted and this court may not consider it.  See 28 U.S.C. § 2254 (b)(1).

**V.    Cumulative Effect of Errors**

Petitioner's final claim is that the cumulative effect of the errors at trial violated his due process rights.  (Pet. (ECF No. 1 at 23, 92-93).)  Above, the court assumes that counsel erred in failing to object to the gang expert testimony and finds that the prosecutor erred in closing argument.  However, for the reasons described above, the combined effect of those errors did not render petitioner's trial fundamentally unfair.  The errors affected different aspects of trial.  The first allowed testimony regarding petitioner's intent to help Norteño gang members in their criminal enterprises.  The second involved the question of whether murder was a natural and foreseeable consequence of the crime of fighting or challenging to fight.  Therefore, the prejudice analyses above covers the effects of these two errors and they did not, considered together, render petitioner's trial fundamentally unfair.

**CONCLUSION**

Petitioner has failed to establish that the decision of the California Court of Appeal rejecting his claims was contrary to, or an unreasonable application of, clearly established federal law or was an unreasonable interpretation of the facts.  See 28 U.S.C. § 2254(d).  Because petitioner fails to satisfy any of the requirements of § 2254(d),

IT IS HEREBY RECOMMENDED that petitioner's petition for a writ of habeas corpus be denied.

////

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within seven days after service of the objections. The parties are advised that failure to file objections within the specified time may result in waiver of the right to appeal the district court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991). In the objections, the party may address whether a certificate of appealability should issue in the event an appeal of the judgment in this case is filed. <u>See</u> Rule 11, Rules Governing § 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

Dated: July 6, 2017

_____
DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

DLB:9
DLB1/prisoner-habeas/arms1090.fr